**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ernest W. MULLINS, Jr., Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ivan MULLINS, Defendant-Appellant. Nos. 14837, 15000.**

United States Court of Appeals Seventh Circuit.

Jan. 21, 1966.

Rehearing Denied March 2, 1966.

Anna R. Lavin, John J. Cogan, Chicago, Ill., for appellants.

Alfred W. Moellering, U. S. Atty., Fort Wayne, Ind., for appellee.

Before SCHNACKENBERG, KNOCH and KILEY, Circuit Judges.

KILEY, Circuit Judge.

Ernest and Ivan Mullins, brothers, were tried separately and convicted as principals of aiding and abetting [1] Glen B. Garrott, cashier of Farmers State Bank in Brookston, Indiana, in a wilful misapplication of bank funds and credits in violation of Section 656, Title 18, United States Code. Both Mullinses have appealed and, because of common questions raised, we consider the appeals together. We affirm the convictions.

Garrott was cashier of the Farmers State Bank (hereafter referred to as Bank) when in 1948 or 1949 his association with Ernest Mullins began. Later Garrott met Ernest's brother Ivan. Garrott and Ernest Mullins began a business association which eventuated in the indictments. Originally both owned G & T Manufacturing Corporation, with Garrott arranging the financing, and they apparently commenced operation of the business with Garrott's issuing fraudulent cashier's checks against the Bank, using a "plugged figure" [2] on the Bank's books to cover the fraud. Subsequently

1. 18 U.S.C. § 2.

2. Witnesses explained that a "plugged figure" was a "faked figure" entered on the Bank's books to cover Exterior checks which were not covered by funds in Exterior's account.

Ernest Mullins started a new business venture under the name Exterior Contracting Company. He owned and ran the company and employed his brother Ivan.

Garrott, although at the trials disclaiming any ownership or managerial interest in Exterior, continued his fraudulent conduct in rendering financial assistance to Exterior through Ernest and Ivan Mullins. He used about $200,000 of his own money and about $700,000 of the Bank's in paying Exterior checks drawn upon the Bank without sufficient funds. Garrott would hold the checks in a desk drawer until he could "pick them up" with his own money or a collection from Exterior. He kept an accurate record of what the "plugged figure" had to be for the checks which were not covered legitimately. He induced other Bank employees to cooperate with him in concealing the fraud. In the beginning he would make up the difference with his own funds before the bank examiners would come in. This had continued for a period of more than thirteen years when, in July of 1963, the fraud was discovered, at which time the "plugged figure" was approximately $600,000.

An official examination of the Bank was impending in 1962. Garrott, then without money of his own, conceived the idea of a "check kite" to keep the Bank's books in balance while the examination was under way, *i. e.*, so that he would not be holding any checks for Exterior on a Monday morning, when the examiners arrived. The kiting worked this way, for example: Ernest or Ivan Mullins would give Garrott an Exterior check drawn on a distant bank sufficient in amount[3] to "pick up" the accumulated overdrawn checks of Exterior which had been concealed by Garrott. The account in the distant bank would not be sufficient to cover the check. The check would be deposited in the Bank to cover the accumulated checks, and then sent to the distant drawer bank for payment. Garrott would then issue a cashier's check[4] to Exterior, a bit more than the Exterior check which Mullins would deposit in the distant drawer bank. Garrott did not enter the cashier's checks on the Bank's books as liabilities. When the cashier's checks were returned, Garrott took them to his drawer and started his records all over again.

The indictment charged each Mullins brother with aiding and abetting Garrott, a bank officer, in the violation of Section 656, and consequently their liability to punishment is that of a principal under Section 2, Title 18, United States Code.

The general charge in the indictment of aiding and abetting Garrott is particularized in each of the four counts against each Mullins with the further charge that said Mullins and Garrott "with intent to defraud * * * did wilfully misapply * * * moneys, funds and credits of the Bank * * * in that Glen B. Garrott * * * did issue and deliver a Cashier's check drawn by the Bank upon itself, * * * payable to Exterior Contracting Company and endorsed Exterior Contracting Company by * * * [Ivan or Ernest] Mullins, * * * [when each] then and there knew said Cashier's check was issued without sufficient consideration * * *, whereby the possession, control and use * * * of the moneys, funds and credits of the Bank were depleted and lost to the Bank and were then converted and misapplied to the use and benefit of * * * [each] Mullins * * *."

3. Some were signed in blank, which Garrott then filled in for the appropriate amount.

4. Each of the four counts against Ernest Mullins is based on a different check: Count V, in the sum of $75,900.00; Count IV, $100,000.00; Count VII, $90,000.00; and Count VIII, $110,000.00. Count I against Ivan Mullins was based on a check for $45,000.00; Count II, $63,200.00; Count III, $42,750.00; and Count IV, $42,250.00. The checks in Counts I–IV were endorsed for Exterior by Ivan; those in Counts V–VIII for Exterior by Ernest.

Both Ernest and Ivan Mullins contend that the indictment is fatally defective in that it neither charges "how Mullins aided and abetted" nor alleges "wilful" action[5] or "a bad purpose and an evil motive" by defendants.[6]

■■ We think the alleged action of each Mullins in endorsing the cashier's checks, with knowledge that there was no consideration even though it followed the alleged action of Garrott in issuing the checks, was sufficient to charge "how" each Mullins aided and abetted, and to "associate" each brother as a participator in the alleged unlawful enterprise he worked to bring about. Benchwick v. United States, 297 F.2d 330, 334–335 (9th Cir. 1961); United States v. Chiarella, 184 F.2d 903, 909 (2d Cir. 1950), cert. denied 341 U.S. 956, 71 S.Ct. 1009, 95 L.Ed. 1377 (1951). And while it is true that an intent to injure or defraud the Bank is an essential element of the offense (Section 656) defendants allegedly aided the commission of, we think that this element is sufficiently alleged here in the words that each Mullins, and Garrott, "with intent to defraud" did "wilfully misapply" the Bank's funds. Logsdon v. United States, 253 F.2d 12, 14 (6th Cir. 1958).

We see no merit in the contention of each Mullins that the proof fails to support a finding that the checks issued "without sufficient consideration," that the amounts of the checks were lost to the Bank or its assets depleted, that said Mullins converted the proceeds to his own use or benefit, or that the checks were issued with the intent of defrauding the Bank. Both Mullinses argue that the funds were lost long before the issuance, in 1962, of these cashier's checks, and that the proof shows concealment and falsification by Garrott, but not the crime charged in the indictment, i. e., their aiding and abetting a wilful misapplication of Bank funds.

■■ Garrott pleaded guilty to the indictment and among other things testified for the Government in both trials that no consideration and no "money" was received by the Bank for the cashier's checks in the four counts of each indictment; that the checks drawn by Ivan and Ernest Mullins were covered by the cashier's checks issued by Garrott at times when Exterior's balance on account at the Bank was only nominal.[7] He further testified in both trials that the loss suffered by the Bank was "made good" by insurance and that from time to time he used Bank funds to pay "fraudulently" drawn checks. Also he stated that Ivan and Ernest Mullins endorsed the cashier's checks, that the proceeds of the cashier's checks, subject of the indictment, were used to pay bills of Exterior, that Exterior got the excess that remained, that Ernest Mullins ran, and Ivan Mullins was employed by, Exterior, and that he had discussed details of the check kite with both defendants on numerous occasions. We think this testimony was sufficient to support the findings subject of the foregoing contention. Benchwick v. United States, 297 F.2d 330 (9th Cir. 1961). With respect to Ivan Mullins, there is testimony that he "used" the proceeds of the cashier's checks and the proof that he or some other person benefited by the Bank's money or credit is enough. United States v. Matsinger, 191 F.2d 1014, 1017 (3rd Cir. 1951).

■■ We find no error in the instructions complained of by the Mullinses. Ernest claims that, in discussing the Government's burden of proof, the court should have contemplated defend-

---

5. The crime it was alleged they aided Garrott in committing, 18 U.S.C. § 656, requires a wilful misapplication.

6. Each defendant had made a motion to dismiss the indictment on these grounds.

7. E. g., when the $75,900.00 check issued, the Exterior balance in the Bank was $6.31; when the $100,000.00 check issued the balance was $130.04; when the $90,000.00 check issued the balance was $130.04; and when the $110,000.00 check issued the balance was still $130.04.

ant's evidence so that the jury would consider all the evidence in determining reasonable doubt. We agree with the Government that subsequent instructions satisfactorily covered the point. We think the court did not err in both trials in defining "wilfully" to mean "that the act was committed voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, and not by mistake, accident, or in good faith." This instruction was taken from a manual on jury instructions in criminal cases drafted by a committee headed by Judge Walter J. La Buy.[8] The same is true of the court's definition of "knew."[9]

Ernest alone contends that the charge given on specific intent is "absolutely erroneous." We disagree, as this instruction too is taken from the manual,[10] and the court fully instructed that an essential element of this offense is that Ernest acted "with the specific intent to defraud the bank." Ivan argues further that the court erred in its instruction concerning credibility of testimony of an accomplice, and in refusing to give his instruction on this point.[11] We disagree, as the cautionary instruction given,[12] and the balancing instruction as to all witnesses, adequately state the law. Likewise, the balancing instruction given with respect to all witnesses justifies the instruction given with respect to the credibility of defendant Ernest as a witness in his own behalf. United States v. Marshall, 266 F.2d 92,

95 (7th Cir. 1959). Our review of the instructions as a whole shows that the juries in both trials were fairly charged.

We think the evidence amply supports a finding of guilty knowledge on the part of Ivan Mullins. The testimony of Garrott concerning his dealings with Ivan Mullins with respect to the Terre Haute bank, and of his detailed explanation to Ivan of the "check kiting scheme," is sufficient without the testimony of Alberta Ade, Garrott's assistant, concerning a later telephone conversation. And Garrott's testimony in the Ernest Mullins trial was not contrary to his testimony in the later Ivan Mullins trial. Garrott explained that in Ernest's earlier trial his testimony was confined to the four cashier's checks which were the basis of the counts charged against Ernest Mullins. Finally we cannot say that the district court abused its discretion in limiting the cross-examination of Garrott with respect to the disposition of "another indictment" pending against him. He had already testified on cross-examination that he was serving sentence upon his plea of guilty to the charge in this case, and on redirect testified that he received no "promises, threats or inducements" for his testimony in either case.

Each defendant has raised other minor contentions, which we have considered and find to be of no merit.

Judgments and convictions affirmed.

---

8. SEVENTH CIRCUIT JUDICIAL CONFERENCE COMMITTEE ON JURY INSTRUCTIONS, JURY INSTRUCTIONS IN FEDERAL CRIMINAL CASES § 4.06 (1965) (hereafter cited as JURY INSTRUCTIONS), also reported at 33 F.R.D. 553. The instructions in the manual are supported by the latest case law and comments.

9. JURY INSTRUCTIONS, § 4.05; 33 F.R.D. 553.

10. JURY INSTRUCTIONS, § 4.04; 33 F.R.D. 550–551.

11. Which stated that "too much reliance should not be placed upon it unless it is corroborated by other credible evidence."

12. An identical instruction was approved in United States v. Echeles, 222 F.2d 144, 160 (7th Cir.), cert. denied, 350 U.S. 828, 76 S.Ct. 58, 100 L.Ed. 739 (1955).